JOHN CARTER v. STATE OF NEBRASKA.

FILED MARCH 29, 1893.   No. 5012.

1. **Conviction for Larceny:** EVIDENCE HELD INSUFFICIENT to sustain the verdict.

2. **Criminal Law:** LARCENY: EXAMINATION OF WITNESSES. To justify the proving of contradictory statements of a witness for the purpose of impeaching him, the answer of the witness on cross-examination must be material so that the cross-examining party would be allowed to give it in evidence. (*Smith v. State*, 5 Neb., 181.)

3. ———: CHARACTER OF ACCUSED: IMPEACHMENT OF WITNESSES. Where a person on trial for a crime has not himself put his general character in issue, the state cannot do so on the pretext of impeaching a witness by disproving the statements of the witness.

ERROR to the district court for Washington county. Tried below before HOPEWELL, J.

34

*Jesse T. Davis,* for plaintiff in error.

*George H. Hastings, Attorney General,* for the state.

MAXWELL, CH. J.

The plaintiff in error was convicted of stealing certain live hogs of the value of more than $35, and was sentenced to imprisonment in the penitentiary for the period of four years. The first objection is that the verdict is not supported by the evidence. The testimony of Mr. Russell, the owner of the hogs, as to the number and kind of hogs taken, is as follows:

Q. When did you see them last before that?

A. It was along perhaps the 4th or 5th; the 5th maybe, along there. It was after the 1st, several days, that I looked them over again to see if they were there, all of them, as I often did once in a week or two.

Q. When was it you missed them?

A. About the 9th, maybe the 10th.

Q. How many did you miss?

A. Nine; that is what I think it was. I cannot count correctly not to a hog, but it was not less than eight nor more than ten.

Q. And they were taken in this time, between the 5th and 9th?

A. Yes, sir.

Q. How large hogs were they?

A. There was two of them—well, one I would call a large brood sow, and then a medium sized—good size—and the balance of them with the 200 there together, a part of them spring pigs and a part older. Understand that I could not guess—that is to within maybe fifty pounds—but I thought if they took an average, it would be a little under 200, and if they took better than an average it would be a little over 200.

Q. About what time did you know, and do you know now, what the price of hogs was? That can be answered by yes or no. State whether or not you did or did not know.

A. I did at the time but have forgotten now. I did know at the time, but I have forgotten what it was at that time.

Q. Are you able to state what the value of those hogs were at that time?

A. Well, taking that except those two—those two, I know about what they were worth. They were worth, the smallest ones, about twelve dollars, and the others about fifteen for those two brood sows I speak of, and the shoats that I called them, I would think from my recollection of the price, six or seven dollars would be enough for them.

Q. Seven dollars apiece?

A. Seven dollars a head; yes, sir.

Q. What would you put the total value of the nine that were taken?

A. It would be a little over sixty dollars.

It will be observed that his testimony is but little better than a guess either as to the number or value of the hogs, and his is all the testimony upon that point. He also testifies in regard to finding one of the hogs as follows:

Q. Did you see any of them after that?

A. Yes, sir.

Q. How long afterwards?

A. I think it was the 25th. It was either the 25th or the 26th of January of the same month, that I saw them. Either the 25th or the 26th.

Q. Where?

A. I saw them at Bill Taylor's.

Q. Where is that from your place?

A. About three miles and three-quarters north and half a mile east.

Q. That is in what county?

A. That is in Washington county, state of Nebraska.

Q. That Bill lives?

A. Taylor lived there; yes, sir.

Q. How came you to see this animal?

A. Well, I had got on a little track of what we call the gang there. We termed it that way. That is what we call them, and we got a little help and had a man looking there; that is the truth of it, and then he told me there was a hog there. I went there looking for this hog and found it there.

Q. Where was the hog?

A. It was in a pen between two corn cribs. I would say the cribs were ten feet apart facing south. Around here back of the corn crib it was fenced a hog pen, and between these two cribs there was boards laid across and hay, etc., laid over, and after looking every place else about the place, I got into that hog pen and I crawled back two or three feet maybe and the hog could not turn around. There was a little partition cut off there, and there was that hog.

Q. Could the hog get out itself?

A. No, sir; not without breaking the fence. Certainly not.

Q. Was the hog at that time permitted to pass out to view so that people generally could see it?

A. No, sir; it was planked up, the back part of it, and it could not get out. It was shut up.

Q. Did you ascertain how it came there?

A. Well, I did by Bill Taylor.

Q. He was the man that lived there?

A. Yes, sir.

Q. When he told you anything about it was the defendant present?

A. No, sir.

Q. Did you look after this same hog again?

A. Yes, sir.

Q. How long afterwards?

A. The next day.

Q. Was it there?

A. No, sir.

Q. Where was it; where did you find it?

A. I did not find it the next day : it was not there.

And this is all the testimony as to finding any of the hogs. The plaintiff in error is a son of a neighbor of Mr. Russell and the only direct testimony to connect the plaintiff in error with the transaction, is the testimony of Mrs. Taylor. She testifies that between the 6th and 10th of January, 1891, the plaintiff and one Spence came to their residence.

Q. Where was your husband's team the next day?

A. I do not know where it was.

Q. Was it at home?

A. No, sir.

Q. When did it return?

A. I think it returned the next evening. I am not positive.

Q. Who came with it?

A. I do not know who came with the team. I saw Carter and Mr. Spence there.

Q. What did they do there that evening?

A. Well, they were out of doors. I did not see them.

Q. Didn't they come in the house?

A. They were in the house, but I was in another room. I had gone to bed.

Q. What did they say or do there?

A. I did not hear all they said.

Q. Did you see them do anything?

A. No, sir.

Q. Did you see them have any money there?

A. The door was open and seen one of them pay my husband some money.

Q. How much money?

A. I think about seven dollars.

Q. The morning before that, or that morning, state if you had discovered a hog at your place?

A. Yes, sir; there was a hog there.

Q. What kind of a hog; just describe it?

A. It was black and white spotted.

Q. The size, give that the best you can.

A. It would weigh 250 or 300 pounds.

Q. What was said between Mr. Carter, Mr. Spence, and your husband in reference to this sow?

A. I did not hear their conversation about the sow?

Q. It was a sow?

A. Yes, sir.

Q. You did not hear any about the sow?

A. No, sir.

Q. How long after that did the sow remain there?

A. It was about two weeks I think.

The hogs were kept by Mr. Russell in a large inclosure, the fence being composed of seven barbed wires. It appears from other testimony that some of them broke out at times, but whether or not they strayed at such times is not stated. For aught that appears this money may have been derived from a perfectly legitimate transaction, and in the absence of proof to the contrary this is the presumption. The testimony shows that the plaintiff is known to have been at home the first six days in January, 1891, and if testimony in his behalf is to be relied upon, his whereabouts is accounted for up to the 10th instant. In the latter part of January, 1891, the plaintiff in error went to Sioux City, and from there to Missouri, and hired out to a man near Lathrop, and had been there about five weeks when he was arrested and came voluntarily back to this state. There is testimony tending to show that the plaintiff in error, for some time before the larceny in question, had frequented saloons and seemed to be starting in the road to ruin, and these facts seem to have induced the jury to convict. It also appears that a son of Mr. Russell

went to Lathrop and called on the village marshal to assist him in arresting the plaintiff in error. From the scene that followed it is apparent that either the marshal or young Mr. Russell stated to certain persons that they were about to arrest a thief. The result was that when young Mr. Russell and the marshal had arrested the accused at the residence of a Mr. Brown and were about to take him to the village for examination they were met by a mob of fifteen or more persons, who took the accused to a tree and hung him to make him confess being connected with a larceny in Missouri. Having failed in obtaining a confession for the alleged crime the mob undertook to make him confess the stealing of the hogs in question. In this also they failed, whereupon the prisoner was surrendered to the custody of the marshal and volunteered to return to this state without a requisition. While the trial was in progress this hanging in Missouri was stated by the prosecuting officer to the court and jury, although up to that point no evidence in regard to the matter had been offered. Afterwards testimony was introduced in regard to the matter. The testimony was clearly irrelevant and was highly prejudicial. The crime, if one had been committed, of which there is absolutely no proof, had no connection with the charge in this case, and all reference to it should have been excluded. There are also some alleged admissions of the plaintiff in error which he denies absolutely, and in any event are not sufficient to show him guilty of the crime. The most damaging testimony is the alleged cross examination of his father as follows:

Q. Didn't you meet W. H. Russell on the county road west of Herman about the last days of January, 1891, the exact day I cannot state, and did not W. H. Russell say to you at that time, "I suppose you know what I have been doing with hog thieves and was afraid you would take exceptions," and you said at that time and place to W. H. Russell, "you are doing right in prosecuting these men;

I have talked to John, my son, about his way of doing, time and again, and he tells me it is none of my damned business; he is hardly ever at home, and when he comes he only stays an hour or two; he is not at home nights at all and is off again, and it is nearly killing his mother; she don't sleep nights at all; I will do nothing more for him; I have helped him out of one scrape which took some money and I will not interfere in any way hereafter." Didn't you say those words to that effect?

This is repeated in about a dozen different forms on the part of the state and brought the general character of the accused directly before the jury, as well as being collateral to the issue.

The rule is thus stated by Bishop (Cr. Proc., sec. 1112) as follows: " Bad character is never admissible in evidence against a defendant as foundation for presuming guilt. Not even on a charge of stealing a horse can it be shown that he is an associate of horse thieves. On the other hand as a branch of the general presumption of innocence, his character is presumed to be at least of ordinary goodness. But when this presumption has been met by *prima facie* evidence of guilt he may bring forward in defense his good character, in rebuttal whereof the prosecuting state may show that his character is bad. (*People v. White*, 14 Wend. [N. Y.], 111; *State v. Jackson*, 17 Mo., 544; *Thompson v. Church*, 1 Root [Conn.], 312; *State v. Merrill*, 2 Dev. [N. Car.], 269; *Dowling v. State*, 5 Sm. & M. [Miss.], 664; *State v. Lapage*, 57 N. H., 245; *State v. Hare*, 74 N. Car., 591; *Harrison v. State*, 37 Ala., 154; *People v. Fair*, 43 Cal., 137; *Cheny v. State*, 7 Ohio, 222; *Ante*, secs. 1103–1106; *Ackley v. People*, 9 Barb. [N. Y.], 609. See *The State v. Ford*, 3 Strob. [S. Car.], 517, note; 3 Greenl., Ev., sec. 25; *Schaller v. State*, 14 Mo., 502; *Dupree v. State*, 33 Ala., 380; *State v. Wells*, Coxe [N. J.], 424; *McDaniel v. State*, 8 Sm. & M. [Miss.], 401; *Carter v. Commonwealth*, 2 Va. Cas., 169; *Reg. v. Rowton*, Leigh

& C. [Eng.], 520, 10 Cox C. C., 25; *Young v. Commonwealth*, 6 Bush [Ky.], 312.)"

In regard to the impeachment of a witness by proving contradictory statements made by him the rule is this : If the answer of a witness is of a nature that the cross-examining party would be allowed to give it in evidence, then it is a matter in which the witness may be contradicted and is deemed material. (Maxw. Cr. Proc., 608 ; 2 Phillips, Ev., 959; *Smith v. State*, 5 Neb., 183.) In the case last cited an attempt was made, as in this case, to impeach a witness by showing that on a former trial he had testified that he was only ten or fifteen rods away from the scene of the crime, but the court held the question was collateral to the main issue and not material. Now no one will contend that the answer of the father, made in the absence of the son, which, at most, is a mere opinion, could be given in evidence to show the guilt of the son. Yet this is the kind of testimony resorted to in this case, although he swears positively that he had no knowledge of such guilt. The case of *People v. Cox*, 21 Hun [N. Y.], 47, is somewhat similar in this respect to the case at bar. In that case the mother of the accused testified that he was at home when a certain letter was delivered, and on cross-examination she was asked if she had not stated to certain persons, naming them, that he had written such letter. These persons were then called to prove the fact, but the testimony was held to be improper and was excluded. (*State v. Patterson*, 74 N. Car., 157; *State v. Patterson*, 2 Ired. Law [N. Car.], 346 ; *Wilder v. Peabody*, 21 Hun [N. Y.], 376; *Kaler v. Builders' Mut. Fire Ins. Co.*, 120 Mass., 333.)

There is some proof that the plaintiff in error was advised that a warrant had been issued for his arrest; that being so informed he went to Sioux City, and from there to Lathrop, Missouri; that a family was residing near there who were former neighbors of his father; that he was

employed by a farmer at that point, and was working for him when arrested. It also appears that when arrested he gave the name of J. W. Baxter. Considerable stress is laid by the prosecution upon this change of name. The accused himself denies having changed his name, but had the check for his wages when arrested filled out in that name, as it was his mother's maiden name. A change of name is always a strong circumstance tending to show an anxiety of the party to hide his identity, but it does not establish a party's guilt. It at the most is a mere circumstance to be considered with others in the case. In regard to the alleged confessions of the accused to young Mr. Russell it is sufficient to say that, at the most, they show an anxiety on the part of the plaintiff in error to be relieved from the charge. We must consider his youth, his inexperience, and the confidence he reposed in young Mr. Russell. He made no confession of guilt, but expressed an anxiety to have the matter settled, etc. Throughout he showed a lack of knowledge, or disregard of his rights, that fall far short of showing guilt. It is doubtful if the prosecution was conducted with that regard for the rights of the accused which the constitution and the laws of the state guarantee to every person accused of crime. The testimony consists largely of guesses and inferences, and the one party who is clearly shown to be guilty is not even charged with crime. The testimony is wholly insufficient to sustain the verdict, and the judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.