HERMAN BOCHE v. STATE OF NEBRASKA.

FILED JUNE 25, 1909. No. 15,616.

1. **Witnesses:** IMPEACHMENT. Proof of specific acts is not ordinarily permissible upon the question of general reputation.

2. **Criminal Law:** INSTRUCTIONS. The instructions discussed in the opinion *held* to be without prejudice to the rights of the accused.

3. **Witnesses:** CROSS-EXAMINATION. A cross-examiner is not bound by the answer of a witness to a question upon a subject that is germane to the main issue.

4. ———: IMPEACHMENT. A witness testified to a fact material to and in support of one of the defenses interposed by the defendant, and on cross-examination stated that he had communicated the fact in question to A and B. The state, over objections, was allowed to show by A and B that the witness had never made such statements to them. *Held*, That the court in the exercise of a sound judicial discretion properly admitted the evidence.

ERROR to the district court for Madison county: ANSON A. WELCH, JUDGE. *Affirmed.*

*William V. Allen, M. D. Tyler* and *Burt Mapes,* for plaintiff in error.

*William T. Thompson, Attorney General,* and *George W. Ayres, contra.*

DEAN, J.

Herman Boche, who is hereinafter called the defendant, was charged with murder in the first degree, tried and convicted of manslaughter, and sentenced to serve ten years in the penitentiary. To reverse the judgment he prosecutes error to this court. The record is voluminous and, among others, discloses these facts: The defendant is a farmer who, at the time of the trial and for many years prior thereto, resided within about three miles of Norfolk. He was an intimate friend of Frank Jarmer, the deceased, who was a saloon-keeper in that city, and is shown to have been a man in moderate circumstances, while the defendant is a man of considerable means. In the afternoon of April 30, 1907, the defendant was in Norfolk and visited the saloon of Jarmer where he drank some liquor. He then returned to his home, and after supper returned to Norfolk on foot, and, he testifies, with about $800 in currency on his person, out of which it was his intention to loan to Jarmer $750, in pursuance of a former arrangement or understanding between them, to procure a liquor license for the fiscal year then about to begin, provided the latter would give him sufficient security for the loan.

The defendant's son, Walter, corroborates the defendant's testimony in that he says he saw his father getting, as he expressed it, "quite a big bunch" of money at home before he left for Norfolk in the evening, but he does not know how much. And the defendant's wife testifies that she missed the money the next day from the place where it was usually kept. It is in evidence that the defendant, before leaving home to go to Norfolk in the evening of April 30, procured a revolver and took it with him. The fiscal year of 1906 was about to close, and the testimony tends to show that the deceased was fearful that he would be unable to raise the sum of $750, which would be necessary to procure a liquor license for the ensuing year, and that the deceased was under the impression that his saloon license for 1906 would expire on May 1, 1907, thus necessitating immediate payment of his license fee or the closing up of his saloon in Norfolk. The proof also shows that the defendant remained in Jarmer's saloon until about midnight, when the place was closed, and the deceased and the accused went to a restaurant to procure a lunch. The defendant testified that soon after arriving at the restaurant he left the room for a few minutes, and returning and partaking of some coffee complained to deceased that it was not good and "tasted awful bitter and bad," but no other witnesses testified to this effect. After they partook of the refreshments Jarmer procured a hack driven by one Lee Vroman, who drove the defendant and the deceased to a notorious resort kept by one Edna Ingham just outside of the city limits, where they remained until about 5 o'clock the next morning. The evidence shows that the defendant was so badly intoxicated when he arrived at the resort that he could not control his movements. It is shown that he expended something like $40 in that place, purchasing a large amount of beer at $1 a bottle for the use of the inmates and visitors, and that he continued to drink beer during the night, and at 5 o'clock in the morning was in a state of profound stupor.

The testimony of the state is to the effect that at about 5 o'clock in the morning of May 1, Edna Ingham desiring to close up her place, the visitors prepared to depart, and that Boche at that hour was sitting in a chair, in the front room, and, while he was apparently in a condition of extreme intoxication, Jarmer pulled him from his chair onto the floor and dragged him across the room, through the door and across the porch, and tried to place him in Vroman's hack that was in waiting there, and that the defendant resisted, but finally was overpowered and placed therein. It is shown that he got out and started away, and that the defendant wanted to walk and the deceased wanted to ride, and that the former refused and resisted the attempts of the deceased to induce him again to get into the hack. Boche then drew his revolver and deliberately shot Jarmer down, exclaiming as he did so: "God damn you, I fix you, God damn son of a bitch." He completed the tragedy while his companion and friend was helpless on the ground begging for mercy. Jarmer was unarmed, and died within an hour. After his death but a small amount of money was found upon his person, perhaps not to exceed $10. The defendant testified that he could not remember what transpired after he drank the coffee at the restaurant until he regained consciousness outside of the lewd resort early the following morning, and that even then his mind was cloudy, and his present recollection of the transaction is uncertain; but he testified that he remembers that he was attacked by two men who choked him and put their hands in his pockets, and that he then learned that his money was gone, and that upon making this discovery he at once drew his revolver and fired in self-defense, and only remembers that he was then relieved from further attack and started for home, and does not know where he went other than that he found himself the following night in a pig pen, and from thence went home.

One theory advanced by the defendant was that Jarmer, knowing that he had a large amount of money on his per-

son, plied him with intoxicating liquors at the saloon, and drugged his coffee at the restaurant and induced him to drink large quantities of liquor at the resort where they spent the remainder of the night, and in the morning, in company with the hack driver, assaulted and robbed him. The state produced two eyewitnesses to the homicide, Vroman, the hack driver, and Edna Ingham, the keeper of the resort. Dr. Mackay testified for the defense that shortly before the shooting, possibly a day, he was in Jarmer's saloon, and that while Boche was in there drinking Jarmer called him, the witness, aside and said, referring to the defendant, he knew a fellow that had money that "I can get, if you give me some drops," but that at the time he thought Jarmer was either joking or intoxicated, and did not give him any drugs as suggested. On cross-examination the witness was asked if he had told any one about Jarmer's statement, and he named several persons to whom he said he thought he had repeated what Jarmer had said to him. Two of those individuals were called by the state on rebuttal, and, over defendant's objections, permitted to testify that Mackay never made the statements to them.

The defendant insists the court erred in permitting this testimony to go to the jury, and argues that it is collateral to the main issue. The rule is elementary that, where a cross-examiner asks a question and the answer elicited is a response that is wholly collateral, he is bound by the answer and cannot call another witness to contradict him. The enforcement of the rule is in consonance with reason, and to relax it would tend to interminably protract the trial of even the most trivial case. As to what is or is not collateral to the issue in the immediate case on trial must then, in the exercise of a sound judicial discretion, determine the application of the rule. This point, owing to its important bearing in this case, has given us some perplexity, but after a careful examination we conclude the trial court did not err in permitting the testimony com-

plained of by the defendant to go to the jury for the reasons herein shown. The inquiry did not, strictly speaking, relate to collateral matter. Its purpose was to turn a light directly upon certain testimony adduced upon a vital point to test its probative value. It was competent for the jury to have before it every circumstance obtainable that would aid in the discovery of the truth upon every material feature of the case. As we view it, the testimony of Mackay on this point was important, and, in view of the weight of authority, it was competent for the trial court in the exercise of a sound judicial discretion to permit the evidence complained of to be introduced. One of the reasons for the adoption of the rule for excluding inquiry into purely collateral matter, besides the commendable one of brevity, is that the juror's mind may not be diverted from the consideration of the main issue. The holding that the district court did not err in permitting the witnesses to testify in rebuttal on the part of the state, that Mackay did not tell them about Jarmer's request for "knock-out drops," is in no sense a departure from the rule, nor a violation of any of the reasons for its adoption. 1 Wharton, Law of Evidence (3d. ed.), sec. 561: "It has been held that a witness may be asked whether he has not a strong bias or interest in the case, and, if he denies such interest or bias, that he may be contradicted by evidence of his own statements, or of other implicatory acts. * * * It is true that we have cases disputing this conclusion, but it is hard to see how evidence which goes to the root of a witness's credibility can be regarded as collateral to the issue."

*Smith v. State*, 5 Neb. 181, is a murder case that was twice before this court. One Crowell, a witness for the state at the second trial, was asked if he did not testify on the former trial that at the time of the shooting he was only 10 or 15 rods, at the most, from the parties. He answered in effect: I said it was 10, 15, 20, or, may be, 30 rods. The defense called a witness who was present at the former trial and offered to prove that Crowell then

testified he was 10 or 15 rods from the parties at the time of the shooting. This court held the offer was properly denied because, "so far as appears from the record, Crowell could see what transpired, and hear the conversation of the parties, as well at thirty as at ten or fifteen rods. The question of the distance, at which the witness stood, is not a material inquiry in the case; at the most it is a mere expression of opinion."

*George* v. *State*, 16 Neb. 318, is a case wherein the defendant was charged with having committed the offense of robbery upon the person of one Louis Brown on November 19, 1883. Upon his cross-examination the defendant was asked, in substance, if he had not said to one Mamy in the Tivoli garden last August, in the hearing of one Frankie Driscoll: "This feller had got money, come and get into the hack, and I will drive you out, and we will have a chance to get it, or fix him, or anything of that sort?" The defendant answered: "No, sir." After the defense rested, the state called Frankie Driscoll and proved by her that the defendant had used the language attributed to him. The case was reversed on the ground that the defendant was being tried for the commission of an alleged offense which occurred November 19, 1883, and was interrogated and contradicted concerning a statement purporting to have been made by him in August of the same year, the court properly holding that testimony in regard to the August incident was collateral matter.

*Myers* v. *State*, 51 Neb. 517, is a case where the defendant was charged with the offense of statutory assault. One Phena Thams, a witness for the defense, on her cross-examination was interrogated with reference to five or six alleged occasions of immodest conduct on her part with one Thompson, a negro. This question, as the last of the series, was then put to her: "I will ask you if Frank Cross did not overtake you, or find you, and one Charles Burnham on the public highway right north of Utica, embracing each other?" The questions were all objected to, but the witness, being required to answer, denied each of the

charges. The state in rebuttal called a witness and proved by him the substance of the charge conveyed in the last question, and this court, speaking by IRVINE, C., held that the inquiry was concerning collateral matter, and therefore erroneous.

*Gulf, C. & S. F. R. Co. v. Matthews,* 93 S. W. 1068 (100 Tex. 63): "In an action against a railroad company for negligently causing the death of a person walking on its tracks, a witness for plaintiff testified that deceased, or a person of the same name and answering his description, had registered at the hotel where witness was clerk the night before the accident, and had left there the following morning, going in the direction of the place where deceased was killed. On cross-examination the witness testified that he had told but one person of these facts prior to being examined as a witness. *Held,* That, to affect his credibility, it was competent to ask him on cross-examination if he had not read newspaper reports and heard rumors to the effect that deceased had been killed and that it was suspected that he had been foully dealt with, and also to introduce evidence that the person whom the witness claimed to have told about his knoweldge of the whereabouts of deceased was, at the time the witness made the statements, reported to be dead."

*Evansich v. Gulf, C. & S. F. R. Co.,* 61 Tex. 24: "While the rule that only such evidence as is relevant to the matter in issue is admissible applies to the cross-examination as well as the examination in chief of a witness, it is not applied with the same strictness to a cross-examination. Any fact which bears on the credit of a witness is a relevant fact; and this, whether it goes to his indisposition to tell the truth, his want of opportunity to know the truth, his bias, interest, want of memory, or other like fact."

*State v. McKinney,* 31 Kan. 570, is a case wherein the court, speaking by Brewer, J., says: "Where, on the trial of a person charged with murder, more than a year after the homicide a witness for the defendant had testified

to certain material facts, * * * *held,* that the state might on cross-examination ask the witness whom he told, if any one, of these facts; and, upon certain persons being named, might also, in the discretion of the court, prove by such persons that nothing of the kind was ever told them."

From the reasoning in the foregoing decisions as applied to the facts in the present case we are of opinion that the matter in question was not collateral to the inquiry. And it seems clear to us that the facts in the present case are distinguishable from those in *Smith v. State, George v. State,* and *Myers v. State, supra.* And they are also distinguishable from the facts in *Frederick v. Ballard,* 16 Neb. 559, *Carter v. State,* 36 Neb. 481, and *Johnston v. Spencer,* 51 Neb. 198.

The instructions given by the court are vigorously assailed, and the refusal to give instructions submitted by the defendant is assigned as error. The motion for a new trial first filed did not specifically complain of those rulings of the court, but an amendment to the motion was filed by leave of court. Defendant's counsel made a showing that they were unavoidably prevented from filing the amendment within three days, and it seems to have satisfied the district court. We will therefore treat the amendment as if it had been filed in time.

Complaint is made with reference to the court's instructions on the subject of manslaughter, which is as follows: "If you fail to find the defendant guilty of murder in the second degree, and do find, beyond a reasonable doubt from a consideration of all the evidence in this case and the instructions given you, that the defendant at the time and place charged in the information did unlawfully kill the said Frank H. Jarmer, without malice, upon a sudden quarrel, then you will find the defendant guilty of manslaughter, and so say by your verdict." The statute defines manslaughter as: "If any person shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed

guilty of manslaughter; and, upon conviction thereof, shall be imprisoned in the penitentiary not more than ten years nor less than one year." Criminal code, sec. 5. As we understand counsel for defendant, they argue that unless the slayer is engaged in an unlawful act independent of the homicide, he cannot be found guilty of manslaughter. The statute, as we view it, does not change the common law which defines that crime as: "The unlawful killing of another, without malice * * *. upon a sudden heat; or involuntarily, but in the commission of some unlawful act." 4 Blackstone's Commentaries (Hammond), *191. The Ohio code on this subject is the same as that of Nebraska. Both the state and the defense rely on *Sutcliffe v. State,* 18 Ohio, 469, as sustaining their respective positions. The question determined in that case was concerning the sufficiency of one count in an information which purported only to charge manslaughter, and does not, as we understand it, support the defendant's contention herein. In the case at bar, although the charge of manslaughter is not set out in the information in apt words, yet it is, as a matter of law, contained in the charge of murder in the first degree. In *Weller v. State,* 19 Ohio C. C. 166, in considering the Ohio statute, it was held that, to convict a defendant of manslaughter, it must be proved *either* that the killing was done in a sudden quarrel, or while the slayer was in the commission of some unlawful act, and such we consider to be the law of Nebraska. In the first class of cases referred to in the statute the homicide must have been intentional, but in sudden passion or heat of blood caused by a reasonable provocation, and without malice; in the latter clause the killing must have been unintentional, but caused while the slayer was committing some act prohibited by law and other than rape, arson, robbery or burglary. Criminal code, sec. 5; Clark and Marshall, Law of Crimes (2d ed.), sec. 255 *et seq.* It may be that in some cases the mere use of the word "unlawful," in defining the crime of manslaughter, might leave the

jury to conjecture what was or was not unlawful, but we do not think there was or could have been any misapprehension on the part of the jurors in the present case, because they were fully instructed as to self-defense, insanity and intoxication, and a consideration of all of the instructions together would advise them fully concerning the alleged unlawful killing of Jarmer. An instruction very like the one considered in the present case was commended in *Savary v. State*, 62 Neb. 166, and in *Bohanan v. State*, 15 Neb. 209.

The defendant complains of the instructions upon "reasonable doubt." The question was perhaps more elaborately discussed in the instructions than was necessary, but we fail to find anything upon this point which could work to the prejudice of the defendant, and they do not present conflicting views. If the question had already been sufficiently elaborated, the instruction asked by the defense should have been withheld. The jury were correctly instructed upon this point.

Proof of specific facts was attempted to be introduced by the defendant to show that Grace Cole, who is shown to be a courtesan and inmate of the Ingham resort, and Lee Vroman, to whom she was engaged to be married, had both testified falsely in a divorce proceeding wherein the Cole woman was a party, to the effect that she was pure and chaste. Complaint is made by the defendant that he was not permitted to introduce this testimony. He also complains because the trial court sustained an objection to the following question propounded to the witness Mackay "tending to show the vicious character and habits of Jarmer," and that the deceased was "irritable, quarrelsome and persistent": "You may state one instance, or instances, of assaults or affrays in which Jarmer was engaged which came under your observation a short time, say within a year or less, before the alleged shooting in this case." It is elementary that ordinarily, and as a rule, it is not permissible in a proceeding that has for its end the impeachment of the veracity of a wit-

ness or the impeachment of his general reputation as a peaceable and law-abiding citizen to prove specific facts or instances.

It appears to us from a careful examination of the record that the jury may have concluded from all the evidence that Boche, inflamed with intoxicants, was piqued and annoyed because his companion interfered with his personal liberty in his endeavor to persuade him to quietly leave the scene of their midnight revel, and slew his friend in resentment for his interference. The jury tempered their verdict with mercy, and in view of the record we are not disposed to disturb it. The defendant has assigned 238 errors, and we have examined all of them with care, but must decline to discuss them all specifically, as it would extend this opinion to an unwarranted length.

We find no reversible error in the record, and the judgment must be, and it hereby is,

AFFIRMED.

ROOT, J., dissenting.

I cannot assent to the holding in this case. It seems to me that the state ought not to have been permitted to contradict Mackay's testimony on cross-examination to the effect that he had repeated to certain individuals the statements he claimed Jarmer had made to him preceding the tragedy. The cross-examination was upon a subject collateral to the inquiry, and the state was bound by the answers given. The principle is stated in *Attorney General v. Hitchcock,* 1 Wels., H. & G. Exch. (Eng.) *91: "The test whether the matter is collateral or not is this: If the answer of a witness is a matter which you would be allowed on your part to prove in evidence—if it have such a connection with the issue, that you will be allowed to give it in evidence—then it is a matter on which you may contradict him." Proof that Mackay had or had not repeated out of court those statements would in no manner prove or tend to prove their existence, nor to establish the witness' temper or disposition toward, or interest in,

Boche or the prosecution.   The rule has been recognized and adopted in this court in *Carter v. State,* 36 Neb. 481; *Johnston v. Spencer,* 51 Neb. 198; *Myers v. State,* 51 Neb. 517.   Text-writers and courts generally hold that, if a witness is interrogated, on cross-examination upon a subject collateral to the issue, counsel will not, over objection, be permitted to prove that the witness had not answered truthfully in respect to said collateral subject.   *Rosenbaum v. State,* 33 Ala. 354; *Cokely v. State,* 4 Ia. 477; *Fogleman v. State,* 32 Ind. 145; *Welch v. State,* 104 Ind. 347; *Huber v. State,* 126 Ind. 185; *State v. Benner,* 64 Me. 267; *Davis v. State,* 85 Miss. 416, 37 So. 1018; *Stokes v. People,* 53 N. Y. 164; *State v. Patterson,* 2 Ired. Law (N. Car.), 346; *State v. Roberts,* 81 N. Car. 605; *State v. Davidson,* 9 S. Dak. 564; 1 Greenleaf (Redfield's), Evidence, sec. 462; Gillett, Indirect and Collateral Evidence, sec. 90; Starkie, Evidence (10th ed.), p. *200; Stephen (Beers), Digest of the Law of Evidence, art. 130, p. 450; Underhill, Criminal Evidence, sec. 241; Wharton, Criminal Evidence (8th ed.), sec. 484.   This rule which has heretofore been recognized by this court is simple, easy to understand, expedites trials and serves the ends of justice.   Jarmer's intention to rob defendant and his preparations to that end were material facts for the defense, and any ruling that permitted Mackay to be improperly contradicted by incompetent evidence was prejudicial error.

The thirteenth instruction given by the court on its own motion is to all intents identical with the one criticised by this court in 1905 in *Lillie v. State,* 72 Neb. 228, and with those condemned thereafter in *Mays v. State,* 72 Neb. 723; *Junod v. State,* 73 Neb. 208; *Keeler v. State,* 73 Neb. 441; *Clements v. State,* 80 Neb. 313.   Although none of those cases were reversed, it was held that the instruction criticised should not have been given.   In the instant case the trial court on its own motion also gave two other lengthy instructions upon the same subject, and therein, as the writer understands them, cautioned the

jurors not to give any considerable weight in their delib-
erations to the principle of a reasonable doubt. Those
instructions are in addition to the one given at defendant's
request, to which reference is made in the opinion of the
court. Defendant's testimony is in many particulars in
sharp conflict with that of the witnesses produced by the
state, and it was material for him that the jurors should
have been permitted to give the principle of a reasonable
doubt such weight as it was entitled to in the exercise of
their unhampered judgment. Especially is this true when
we consider that the witnesses who were present when
Jarmer was shot, and who testified for the state, are a
notorious prostitute and an impecunious procurer who had
theretofore subsisted in part upon the earnings of lewd
women, but shortly after the tragedy had negotiated for
the purchase of a hack line in Norfolk, and offered to make
a considerable cash payment down to bind the bargain.

The trial court was in most respects eminently fair and
exceedingly patient, but nevertheless, through inadver-
tence evidently, he did not, it seems to the writer, accord
defendant a fair trial in the particulars above referred
to, and therefore a new trial should be granted.