STATE OF NEBRASKA, APPELLEE, v. JOSEPH L. MORROW,
APPELLANT.
467 N.W.2d 63

Filed March 22, 1991.    No. 90-127.

James Martin Davis for appellant.

Robert M. Spire, Attorney General, and Linda L. Willard for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

A jury found defendant, Joseph L. Morrow, guilty of the two counts charged in the information, count I, second degree murder, see Neb. Rev. Stat. § 28-304(1) (Reissue 1989), and count II, using a firearm to commit a felony, see Neb. Rev. Stat. § 28-1205(1) (Reissue 1989), in the shooting death of Thomas Jordan. Defendant was sentenced to 40 years' imprisonment on count I and to 5 to 10 years' imprisonment on count II. The sentence on count II is to run consecutively to the sentence on count I.

Section 28-304 provides in part: "(1) A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation."

Neb. Rev. Stat. § 28-305 (Reissue 1989) provides in part: "(1) A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act."

Section 28-1205 provides:

(1) Any person who uses a firearm . . . or any other deadly weapon to commit any felony which may be prosecuted in a court of this state . . . commits the offense of using firearms to commit a felony.

. . . .

(3) The crime defined in this section shall be treated as a separate and distinct offense from the felony being committed, and sentences imposed under the provisions of this section shall be consecutive to any other sentence imposed.

At the court's instruction conference, defendant requested the court to include in the jury instructions the crime of voluntary manslaughter as a lesser-included offense of the crime of second degree murder. The request was denied; however, the court did instruct the jury on the crime of involuntary manslaughter as a lesser-included offense of second degree murder.

After defendant's motion for a new trial was denied, he perfected his appeal to this court, assigning five errors: (1) the court's refusal to instruct the jury on the lesser-included offense of voluntary manslaughter; (2) the court's instruction to the jury as to transfer of intent; (3) the court's failure to either declare a mistrial or give a cautionary instruction to the jury because of prejudicial testimony of Officer Lanny Lenker; (4) the court's failure to reinstate two black jurors peremptorily stricken from the jury panel by the prosecutor, thereby denying defendant a fair trial; and (5) the insufficiency of the evidence to support the guilty verdicts.

## FACTS

On Sunday, July 2, 1989, at approximately 1:30 a.m., Morrow, a black person, was at 3602 Lake Street, Omaha, Nebraska, standing next to his car in the parking lot of M & B's liquor store, talking with friends. In the same area there were more than 100 people visiting and milling around, including Rodney Glass and several other members of an Omaha gang called the Crips who had just left a Crip party nearby, where alcoholic liquor and illegal drugs were consumed and used. The victim, Jordan, who was intoxicated and described as acting "hyper," was moving among the crowd, complaining about Morrow and jumping on a car. Shortly thereafter, Glass, along with several Crips, crossed Lake Street and headed in the direction of Morrow. Glass was intoxicated and agitated because of some comments about the Crips attributed to defendant. Glass, cursing as he walked, went up to the defendant and stood directly in front of him, confronting him with profanity. Standing at his left were Joseph Gray and the victim, Jordan. Meanwhile, six or seven other Crips stationed themselves in a semicircle in front of and around Morrow.

The exchange of profanity continued between Morrow and Glass when Morrow told Glass to take his business elsewhere. After further exchanges, Glass threw his hat down and stated that he was going to "kick [defendant's] ass."

Morrow got his gun, approached close to Glass, and fired the gun while either striking or pointing the gun at Glass. Glass was not wounded by the shot; however, he somehow was cut on the

chin and apparently was knocked to the ground by the force of the blow. Immediately after the shooting, the parking lot cleared rapidly. It was only then that Jordan was found on the ground, fatally wounded. Morrow left the area immediately. He testified, "I had thought Rodney had got shot, because when I hit him my gun went off and he fell, so I thought he had got shot." Morrow later learned that Jordan had been shot. Morrow consulted a lawyer and turned himself in to the police after July 4. While released on bond, Morrow was stopped in a car on August 3, 1989, by the Omaha police, who found a .45-caliber automatic pistol under the seat of the car.

As later fully discussed, there is a conflict in the evidence concerning the kind and use of the gun that fired the fatal shot. Some of the evidence indicates that Morrow's gun was discharged only one time. There was other evidence from witnesses that they heard two or three shots fired. Jordan suffered a single gunshot wound to the chest. The bullet was identified by an expert as a .38-caliber hollow-point bullet fired from either a .38- or .357-caliber revolver. Glass did not remember ever seeing Morrow's gun. Defendant testified that the weapon he used to strike Glass was his .45-caliber automatic pistol, which he carried with him for personal protection. This gun was test fired and determined not to be the murder weapon. There is no evidence that any firearms, ammunition, or cartridge casings of any type were recovered at the crime scene.

The State's theory of prosecution was that Morrow, at close range, pointed a .38- or .357-caliber gun at Glass' chin and intentionally pulled the trigger and that the bullet somehow struck and killed Jordan. The State claims the theory of transferred intent is applicable, namely, that Morrow intended to kill Glass but killed Jordan instead.

The defendant's theory of the case was that Morrow, during a confrontation and argument with Glass and using a .45-caliber automatic pistol, struck Glass with the gun and it accidentally discharged. Morrow denied, however, that this was the firearm that killed Jordan. Through counsel, however, it is argued that even if the firearm Morrow used to strike Glass was the firearm that killed Jordan, his conduct would only constitute involuntary manslaughter, if the shooting was

unintentional, or voluntary manslaughter, since the shooting was upon a sudden quarrel.

## VOLUNTARY MANSLAUGHTER

Defendant first assigns as error the court's refusal to instruct the jury on the crime of voluntary manslaughter as a lesser-included offense of second degree murder, arguing that there was evidence of a sudden quarrel, requiring an instruction on that crime to be submitted to the jury.

The crime of voluntary manslaughter is described in § 28-305(1): "A person commits manslaughter if he kills another without malice . . . upon a sudden quarrel . . . ." Also in § 28-305(1), the crime of involuntary manslaughter is described as the unlawful but unintentional killing of a person as the result of the actor's commission of an unlawful act. See *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989).

Malice denotes that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause. Absence of malice may exist where the killing occurs upon a sudden quarrel. "[W]here murder is charged, the court is required, without request, to charge on such lesser degrees of homicide as to which the evidence is properly applicable." *State v. Rowe*, 210 Neb. 419, 424, 315 N.W.2d 250, 255 (1982).

In *Boche v. State*, 84 Neb. 845, 854, 122 N.W. 72, 75 (1909), this court said a killing in voluntary manslaughter cases "must have been intentional, but in sudden passion or heat of blood caused by reasonable provocation, without malice . . . ." Recently, the element of provocation was further addressed in *Pettit, supra* at 454, 445 N.W.2d at 901:

> As used in § 28-305(1), the phrase "sudden quarrel" does not necessarily mean an exchange of angry words or an altercation contemporaneous with the unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. . . . Rather, in relation to manslaughter, a sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control . . . .

Throughout the evidence, Glass and the small group

surrounding defendant are described as Crips, i.e., members of an Omaha gang who usually wear blue clothing. Gray testified that it was common knowledge that the Crips do not get along with a rival Omaha gang called the Bloods.

There is no clear and direct evidence bearing on the immediate cause and origin of the confrontation between defendant and Glass that relates to the sudden quarrel issue. Briefly, in addition to the activity at the crime scene previously described, the jury could find that defendant was by his car. Jordan, who was intoxicated and described as acting "hyper" had some negative conversation with defendant, causing Jordan to complain to Glass that defendant was "sweating" (bothering) him. Jordan, Glass, and Gray then approached within a few feet of defendant, followed by six or seven other persons described as Crips. Defendant had been making some remarks about the Crips. Glass and defendant exchanged strong words and epithets. Glass and other members of the group made threats of violence to defendant that they would get him and kick his ass. Defendant was not sure whether these words were meant for him, but, he testified, "still they acted like they were going to make me the one, you know." Apparently as a response regarding some of defendant's past activity, defendant said, "Don't bring the bullshit here, I sell to Crips, Bloods, whoever." Thereupon Glass said, "Man you are fronting. I'm going to kick his ass," and Glass threw his hat onto the ground. Defendant got and fired his gun, killing Jordan.

Throughout defendant's brief, he argues that there was evidence of a sudden quarrel, requiring submission of voluntary manslaughter to the jury, as shown by statements and events described in the brief as "confrontation," "heated argument," "heated exchange of words," "threats," "intimidating gestures," "angry exchange of profanity," "throwing his hat down in . . . a threatening gesture," and "members of the Crips gang had surrounded [defendant]." Brief for appellant at 12-15.

While there was an exchange of angry words and threats by Glass, nowhere in defendant's briefs or in the record is there a claim or showing that any of those acts and circumstances

which defendant claims to be a sudden quarrel, either singularly or as a whole, were evidence of reasonable provocation disturbing defendant's power of reasoning, causing him to lose his normal control and to act without due deliberation and reflection, as required by *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989).

The court's refusal to instruct the jury on voluntary manslaughter as a lesser-included offense of second degree murder was correct.

Defendant claims that at the instruction conference attended by counsel in chambers at the conclusion of the evidence, the trial judge found that there was a quarrel. Neither party submitted written requested instructions. The record shows that defendant objected to instruction No. 10 concerning the issue of "transfer of intent," because it related only to the charge of second degree murder. Defendant requested that the court also submit an instruction on voluntary manslaughter as an included lesser offense and to amend instruction No. 10 accordingly. The court refused, saying:

> The evidence in this case shows no quarrel of any sort between the defendant and the decedent. The evidence in this case shows the decedent was remote in distance from the quarrel which did exist between the defendant and one Rodney Glass. I think it's the intent of the statute to say that the quarrel has to be between the defendant and the decedent and not between the defendant and some third person. For that reason the Court has not given the lesser included offense of manslaughter upon a sudden quarrel.

Defendant thereafter offered no substitute instruction.

Black's Law Dictionary 1244 (6th ed. 1990) describes quarrel as "an altercation, an angry dispute, an exchange of recriminations, taunts, threats or accusations between two persons."

The judge's comments had their origin in discussing the issue of transfer of intent, the proposed instruction No. 10, and defendant's objection. The judge used the word "quarrel" only as a general description of the related circumstances without regard to either the presence of provocation or the definition of "sudden quarrel" as found in *Pettit, supra*. The judge may have

been relying on *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975), which held that the provocation doctrine in voluntary manslaughter cases does not apply to a nonprovoking victim. The facts therein were that Bautista and one Esparza had a fight. Esparza left the scene. Bautista approached Esparza's father and demanded information as to Esparza's whereabouts. The father refused, and Bautista shot and killed the father. Whether the *Bautista* rule applies to the facts here is not decided, since it has already been determined that there was no submissible issue of voluntary manslaughter. Further, it is harmless error when a correct order is entered, although for an incorrect reason. *State v. Highly*, 195 Neb. 498, 238 N.W.2d 909 (1976).

## JURY INSTRUCTION

Defendant next contends that the trial court committed prejudicial error by improperly instructing the jury as to transferred intent. The transferred intent instruction, instruction No. 10 given by the court, states: "Where one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."

Defendant does not challenge instruction No. 10 as an improper statement of the law concerning transfer of intent, and we do not address that issue. Rather, defendant complains only that the instruction did not include the theory of transfer of intent in a charge of voluntary manslaughter. There is no merit to this claim because (1) the defendant did not tender a substitute instruction and (2) the crime of voluntary manslaughter was not given to the jury in the instructions as a lesser-included offense of second degree murder.

## VOLUNTEERED EVIDENCE

The third assignment of error is that the trial court failed to either declare a mistrial or give a cautionary instruction to the jury concerning a part of defendant's cross-examination of Officer Lenker, who related the details of an interview with defendant as follows:

Q. The location of where he said he retrieved the —

A. (Interrupting) I am saying in the original interview he said he opened the door, I don't know what door.

Q. You don't know what door?

A. He ran to his car and opened the door and came out with what *he described as a chrome-plated .38.*

Q. He also talked about a .44, didn't he, Officer?

[Prosecutor]: I object, improper impeachment.

A. Not that I know of.

THE COURT: What was your objection?

[Prosecutor]: Improper impeachment, Your Honor. I don't know why he is going into a question about collateral matters.

THE COURT: Objection is sustained.

Q. (By [defendant's counsel]) I asked you, Officer Lenker, about locations, did I not? I didn't ask you about calibers, isn't that true?

A. That is true.

(Emphasis supplied.)

From this testimony, counsel was immediately aware of the claim of a possible prejudicial effect of the phrase "a chrome-plated .38." However, no objection was made, and the cross-examination continued briefly. Then counsel complained to the judge about the volunteered statement. The judge suggested that if a motion for mistrial was being considered, the same should be made forthwith. Counsel declined, witness Lenker was excused, and another witness testified. Then counsel moved for a mistrial or in the alternative for the judge to give a cautionary instruction to the jury to disregard the volunteered testimony. The judge refused.

"When a party has knowledge during trial of irregularity or misconduct, he must timely assert his right to a mistrial." *State v. Archbold*, 217 Neb. 345, 352, 350 N.W.2d 500, 505 (1984). "If a party does not make a timely objection to evidence, the party waives the right on appeal to assert prejudicial error." *Id.*

There is no merit to this claimed error. Defendant's motion was not timely made, the ruling of the trial judge was not clearly wrong, and defendant cannot now claim error. Further, there is other strong evidence in the record that the gun held and fired by the defendant was either a .38- or .357-caliber revolver.

Defendant was not prejudiced by the judge's ruling.

## JUROR CHALLENGES

Defendant's fourth assignment of error claims racial discrimination in the jury selection. He contends that the trial court erred by failing to reinstate two black venire members peremptorily stricken from the jury panel by the State. This issue arose after the jury panel had been passed for cause by both parties and after the State and defendant had indicated on the jury panel list their respective juror peremptory challenges, which included the State's striking of three black jurors: Truman Hays, Deborah Prince, and Mark Will. One black juror was not stricken. Before the strikes were announced, the court invited counsel's attention to the list and paused for motions. Thereupon, defendant moved that the panel not be sworn because three jurors were stricken because they were black persons or that, in the alternative, Hays, Prince, and Will be reinstated to the panel.

" 'In order to make a prima facie case of discrimination in the selection of a jury, a criminal defendant must show that (1) she or he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove members of the defendant's race from the venire, and (3) the facts and other relevant circumstances give rise to an inference that the prosecutor used those challenges to exclude potential jurors because of their race.' " . . . "[A] trial court's determination as to whether a defendant has established purposeful discrimination in the selection of a jury is a finding of fact which will not be reversed on appeal unless clearly erroneous."

(Citation omitted.) *State v. Culver*, 233 Neb. 228, 232, 444 N.W.2d 662, 665 (1989). See, also, *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The court's determination of the adequacy of the State's "neutral explanation" of its challenges will not be reversed upon appeal unless clearly erroneous. *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987); *State v. Walton*, 227 Neb. 559, 418 N.W.2d 589 (1988).

A *Batson*-type hearing followed, resulting in reinstating

Hays to the panel and approving the strikes of Prince and Will.

The record contains none of the jury voir dire; therefore this review is limited to the *Batson* hearing. In response to defendant's having made prima facie showings of discrimination, the State provided these neutral explanations of its challenges. Prince was removed because of her youth (from observation); her familiarity with the crime scene, see *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766 (1987); and her lack of regular employment history and because she was female. Will was removed because of his youth (by observation the youngest person on the panel) and his early interest in a prelaw college course. At the time of trial, defendant was 24 years of age. There is nothing in the record showing that the striking of jurors Prince and Will was racially motivated, and we cannot say that the court's finding that the State had articulated neutral explanations of its challenges was clearly wrong. There was no error in striking jurors Prince and Will.

## SUFFICIENCY OF THE EVIDENCE

Defendant claims that there was insufficient evidence to submit count I, second degree murder, to the jury and, particularly, that the element of intent to kill without just cause or excuse was not proven beyond a reasonable doubt.

"In determining the sufficiency of the evidence to support a finding of guilt in a criminal case, this court does not resolve conflicts in the evidence, determine the plausibility of explanations, or weigh the evidence. Those matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them." . . .

" 'On a claim of insufficiency of evidence, the Supreme Court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.' "

*State v. Cortis, ante* p. 97, 110-11, 465 N.W.2d 132, 142 (1991). "[A]fter a jury has considered all the evidence and returned a verdict of guilty, that verdict may not, as a matter of law, be set

aside on appeal for insufficiency of evidence, if the evidence sustains some rational theory of guilt." *State v. Evans*, 215 Neb. 433, 443, 338 N.W.2d 788, 794 (1983).

" ' "[T]he law is settled that independent evidence of specific intent is not required. The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident." ' " *State v. Costanzo*, 227 Neb. 616, 623, 419 N.W.2d 156, 162 (1988).

Defendant's argument is twofold. First, Jordan was killed by a .38-caliber bullet fired by an unknown third person other than the defendant from a gun not produced in the evidence. Second, if the jury could find that defendant did hold and fire the gun that killed Jordan, the gun was discharged accidentally when defendant struck Glass.

Jury instructions Nos. 9 and 11 are standard instructions on the element of intent and on direct and circumstantial evidence respectively.

The conflict in the evidence relating to the facts and circumstances existing immediately before and at the time of the shooting requires a further summary of the evidence considered by the jury. Defendant and 13 other at-the-scene witnesses testified (5 for the State and 8 for defendant). It is noted that most of defendant's witnesses agree on the gestures of Glass and the word exchanges between Glass and defendant and that they had informally discussed the case among themselves.

Dr. Blaine Roffman, an Omaha pathologist, performed the autopsy on the body of Jordan, making findings that Jordan died of a gunshot wound to his upper right chest beveled at the 7 to 10 o'clock position ("the bullet came in from the side, so to speak," lodging "[a]t the level of T7/T8 of the thoracic spine"). In addition, there were 15 other wounds on the chest, face, and arm of Jordan; 13 of the wounds were described as superficial; and 3 contained metallic fragments. Some of the wounds had blackened edges.

Glass testified that at the time of the shooting he was wearing a gold necklace, which he later discovered was missing. This necklace was found at the scene of the crime by the police. It

had been severed.

Mark Stranglen, a laboratory technician for the Omaha Police Division, made an official crime scene search soon after the shooting. The purpose of the search was to collect and preserve all items of evidence that might be relevant to the reported crime. Apparently, the only relevant evidence found was the gold-plated necklace.

Marcellus Deats, senior crime lab technician for the Omaha Police Division, testified generally concerning handguns, ammunition, bullets, and identification of guns. In describing the characteristics of a revolver and the cylinder that holds the cartridges, he explained that each time one pulls the trigger of a revolver, the cylinder rotates, bringing a fresh cartridge up under the firing pin. In describing defendant's automatic pistol, a Colt Combat Commander .45, or a single-action automatic, he stated that the firing procedure requires the user to load the first cartridge from the magazine (clip) by physically withdrawing the slide on the top of the gun (pulling the slide back), which also cocks the gun, making it ready for firing by pulling the trigger. When such a pistol is fired, the cartridge case is automatically ejected, generally falling within a radius of 6 to 15 feet.

Donald G. Havekost, a special agent with the Federal Bureau of Investigation and a specialist in metal analysis, testified that he examined the bullet, pieces of a metal shard (exhibits 31A and B) that had been removed from one of the victim's wounds, and a fractured necklace made of brass coated with nickel and with an outside coating of gold. Exhibits 31A and B, the metal shard, contained brass, nickel, and gold. Havekost testified that both the necklace (at the point of fracture) and the bullet had copper and lead smears, and it was his opinion that "that bullet, or another bullet or object comprised of those two metals, fractured that necklace."

Defendant testified that he had the gun in the right side of his pants ("my gun was right on my side") when Glass threw his hat down. Defendant testified, "He kind of like jumped back and that's when I jumped up and slapped him in the face . . . [w]ith that gun." During defendant's testimony, the following dialog transpired: "Q. Did you take it out of your pants before — A.

(Interrupting) Just like this (indicating), and I hit him on the side of the face just like that (indicating) [and] [h]e fell." Defendant is right-handed.

Witness Gray said that when Glass threw his hat down, defendant ran to his car and came back holding a gun and that defendant "[ran] up to the Crip, and had the gun to his neck, and he shot him," and "I ran." Gray later learned that Jordan had been shot and killed.

There was other evidence concerning defendant's striking Glass. Defendant said that when he slapped Glass, the gun was pointing straight up, "[b]ecause that is the way I would hold it if I was going to hit somebody." Witness Jerome Williams said that defendant struck Glass across the face and "the gun was facing west" (also described as westerly). "It looked like he struck him with his left hand from my side, walked up to him, hit him on the side of the face, and his gun went off after he hit him."

Witness Tony Bass said that defendant struck Glass "upwards" under the chin and the gun went off and that defendant did not strike Glass on the side of the head. Bass also testified as follows:

Q. Now, you saw Joe Morrow cock the gun, didn't you?

A. Yes.

Q. And when you say cock the gun, do you mean pull back the hammer?

A. Yes.

Q. You are sure it was a .45, but you saw him pull back the hammer with his thumb?

A. Yes.

Witness Lisa Brewer testified that the gun held by defendant was pointed straight up when defendant hit Glass. She testified, "[T]he Crip, he took - he threw down his hat, took about two steps back, that's when Joe hit him" with the gun.

Taking the evidence most favorable to the State, we find that defendant admitted holding and firing a gun near the head of Glass. Witness Gray testified that defendant was pointing a gun at and near Glass' neck. There is relevant evidence supported by expert testimony that the gun held and fired by defendant was a

revolver and that the .38-caliber bullet fired from it at close range severed a necklace worn by Glass, the intended victim, and the bullet then traveled a few feet further to Glass' left, striking and killing Jordan and leaving metallic traces of the lead bullet and the severed gold necklace on Jordan's body. There was further relevant evidence from the acts and words of defendant, together with all of the surrounding circumstances, that defendant intended to kill Glass, which intent was legally transferred to the killing of the victim, Jordan. We neither reweigh the evidence nor resolve the conflicts in the evidence. We conclude that there was sufficient relevant evidence sustaining a rational theory of defendant's guilt for the jury to find defendant guilty beyond a reasonable doubt of count I, second degree murder, i.e., the intentional killing of Thomas Jordan without just cause or excuse.

AFFIRMED.