Pricer v. Lincoln Gas & Electric Light Co.

MARY PRICER, ADMINISTRATRIX, APPELLEE, v. LINCOLN GAS & ELECTRIC LIGHT COMPANY, APPELLANT.

FILED NOVEMBER 26, 1923.   No. 22515.

1. **Electricity: NEGLIGENCE: QUESTION FOR JURY.** A street car motorman stopped his car within about four feet of a broken electric light wire which hung down and formed a loop immediately in front of the car. The wire belonged to the defendant, Lincoln Gas & Electric Light Company. It carried about 2,300 electric volts and was brought to the ground by the motorman. Whether he then knew that it was a live wire

does not appear in the evidence. Subsequently, when the wire was on the ground, he discovered that it was a live wire and that it was "spitting" at him. After telling four or five children, who were playing about the street, to move away, he applied a pick-up, which was a part of the car's equipment, to the wire at a point three or four feet from its loose end. The electric current was communicated to his body by the wire and from its effects he died in less than two weeks. *Held*, that, under the facts set forth in the opinion, whether the defendant electric company negligently and carelessly failed to inspect its wire and carelessly and negligently permitted a heavily charged electric wire to remain in place, without sufficient insulation, was a question for the jury; and *held*, that the verdict awarding damages to the decedent's administratrix is free from reversible error and is sustained.

2. **Witnesses:** IMPEACHMENT. Certain questions were addressed to a witness while testifying which would tend to render him criminally liable or expose him to public ignominy. *Held*, that, under sections 8844 and 8848, Comp. St. 1922, such questions were improper and that the court did not err in sustaining objections thereto. *Boche v. State*, 84 Neb. 845.

3. **Appeal:** CONFLICT OF EVIDENCE. The rule has been long established in this jurisdiction that, even though the evidence conflicts, the verdict will not be disturbed if there is sufficient competent evidence to support such verdict.

APPEAL from the district court for Lancaster county: FREDERICK E. SHEPHERD, JUDGE. *Affirmed.*

*Reavis & Beghtol* and *C. E. Sanden*, for appellant.

*Doyle, Halligan & Doyle* and *W. B. Comstock, contra.*

Heard before MORRISSEY, C. J., LETTON, DAY, GOOD and DEAN, JJ., REDICK, District Judge.

DEAN, J.

Mrs. Mary Pricer, as administratrix of the estate of her late husband, Clarence W. Pricer, sued to recover damages from the defendant, Lincoln Gas & Electric Light Company, for the death of her husband, by electrocution, while he was in the employ of the Lincoln Traction Company as a motorman on a "one man car." It is alleged generally that the

above named defendant, hereinafter called electric company, negligently and carelessly failed to have its transmission wires inspected and insulated and kept in proper repair, and that because of such negligence an electric current, from a wire which carried approximately 2,300 volts, was communicated to the body of her husband, while in the performance of duty, from which he died about 10 days thereafter. She recovered a verdict and judgment thereon for $25,000, from which the electric company has appealed.

The Lincoln Traction Company, hereinafter called traction company, was made a party defendant, it being alleged that it claimed some interest in the subject-matter of the action from the fact that under the provisions of the workmen's compensation act of Nebraska it is paying to the administratrix $15 a week on account of her husband's death.

Mrs. E. J. Bstandig was an eye-witness of the facts which immediately led up to the tragedy. She knew Pricer as a street car motorman and was on his car going west when the accident occurred at about 9 in the forenoon. She boarded the car at Thirty-third and Randolph street, which was the street car's eastern terminus. From its starting point Pricer did not stop the car until it arrived at a point midway between Twenty-seventh and Twenty-eighth streets on Randolph, at the alley, where the accident happened, and was about five blocks from the car's starting point. She was the only passenger and was seated about the center of the car on the south side. Mrs. Bstandig said that when Pricer stopped the car in the middle of the block he remarked that a wire was down. Continuing she testified: "And then I could see through the front end of the car that a wire came down and hung over the trolley. * * * Q. Describe to the jury how the wire was hanging as you saw it. A. Well, it came across from the south pole and then it looped down almost low enough for you to—well, you could see it through the front of the car, and then over across the trolley." She further testified that when Mr. Pricer stopped the car the wire was about three or four feet in front of it, and that he got out and reached up and struck the wire with an iron

bar, an instrument which she called a switch-bar, and which she said was about three feet long; that the wire loop hung down in front and was plainly visible from her position in the center of the car. She could not, however, see where the electric company's wire, which caused Pricer's death, came in contact with the trolley wire.

From her evidence it appears that when Pricer returned to the car he remarked that it was a live wire and that it was "spitting" at him; that he got the pick-up, an instrument for handling live wires, from under a car seat and left the car; that some children were playing about not far from the wire, and after he warned them of their danger and told them to go away he applied the pick-up to the wire. Almost instantly he fell on the wire and lay there about 15 minutes before it was removed from under his body. She said that during all of that time Pricer's body quivered and froth came from his mouth and before he was removed his hands were burned to a crisp.

Miss Martha Van Denbark lives at Twenty-eighth and Randolph streets. She boarded the street car where it stopped in the middle of the block, at the alley, between Twenty-seventh and Twenty-eighth streets. She testified that she got on just as Mr. Pricer stepped off and when Mrs. Bstandig, the other occupant of the car, remarked that a wire was down; she, the witness, "rose half way up and looked out and saw the wire hanging there," from the pole on the south side of Randolph street; that part of the wire was down on the ground and that it quivered and smoked and squirmed about like a live wire; that at the same time she saw five children playing near the wire in the street and heard Mr. Pricer warn them to go away; that, shortly afterward, Mrs. Bstandig screamed, and she then saw the motorman fall over the wire; that she started toward him and was about to touch him, when some one told her not to do so, and that she then ran up the street for help.

The home of the C. W. Hoke family is over the grocery store at the northeast corner of Randolph and Twenty-seventh street. From their sleeping porch, which extends

along the entire east end of the second story of the building, the defendant's wires can be plainly seen. Mrs. Hoke testified, *inter alia,* that "about three weeks before this accident—anyway three weeks, or perhaps longer—we had seen streaks of fire in different places on this wire, but we didn't think very much about it until the night before the accident there seemed to be quite a long streak of fire and we remarked about it. * * * Q. And where with reference to whether there were trees or not? A. Well, just at that one place we noticed it particularly, it didn't seem to be near the trees, it seemed to be in the open." She testified specifically that she saw the fire come out of the wire at a point remote from the trees and said she did not report it to any person nor think anything more about it except that it caused her family to fear that it was dangerous. Evidently the jury accepted the version of Mrs. Bstandig and of Miss Van Denbark and of Mrs. Hoke in respect of the condition and the location of the wire that caused the death of plaintiff's decedent.

There is evidence tending to prove that it is customary for electric concerns to be equipped with an automatic switch, or circuit breaker, and that, if the wire was grounded at the point here in question, an automatic switch, if there was one, ought to have "kicked out."

It is alleged, and there is evidence tending to prove, that on the morning of the accident, at about 7:30, a passer-by notified the electric company by telephone that the wire in question was broken down, and that some person in reply thanked his informant and said that the broken wire would be taken care of. The electric company denied that any such information was received by it and introduced evidence which tended to prove that the wire was not down until about 9 o'clock and that it did not discover the condition of its wire until about the time Mr. Pricer was electrocuted. On this point certain trouble report slips of the night operator at the telephone switchboard of the electric company's plant are in evidence. They are numbered consecutively from 4738 to 4759, inclusive. From the evidence of the

operator it appears that two of the report slips are missing, but that he did not know what became of them and that they might have been lost or they might have been duplicate slips of wire trouble reported from the same place by different parties. A portion of the insulated wire, which is in evidence, measures about 92 feet in length. The span which the wire covered measures 100 feet from pole to pole and there was some controversy at the trial as to what became of the 8 feet of missing wire which the record does not seem to make clear.

A witness testified that the pick-up was attached by Mr. Pricer about three or four feet from the loose end of the wire. The electric company contends that this constituted negligence on the part of the motorman in that he did not attach it nearer the broken end. On the other hand, there is evidence tending to prove that a motorman, before he is permitted to operate a car, serves an apprenticeship of about two weeks so that he may become accustomed to using the appliances on the cars; that he has special instructions from the superintendent in respect of the use of the special equipment and appliances; that there is no established rule with respect to the place where the pick-up should be applied to a live wire, but that is left largely to the judgment of the man who uses it; that it is customary for a cautious man to leave two or three feet from the end, for two or three reasons, one to prevent being struck by the idle end of the wire and the other to allow him to form a loop at the end of the copper, if necessary, to tie it up after he gets it up from the ground; that it is a proper practice to pick the wire up so as to prevent it from slipping off; that motormen are, to a certain extent, supposed to handle high-powered wires so as to clear the right of way so that they may proceed with their cars; that they are not instructed in respect of handling wires of other companies unless they interfere with the progress of the car so that they cannot move forward, hence he is instructed to remove such wires from the trolley wire so that if it was hanging down in front of him it became his duty to remove it, but,

on the other hand, if he saw a wire broken and lying on the side of the street he was not expected to stop and pick it up.

The electric company contends that Pricer negligently and carelessly removed the loose wire from where it hung in front of his car. Mrs. Bstandig was interrogated on this point and she testified, as hereinbefore noted, that she saw Pricer with an instrument in his hand, which she called a switch bar, with which the wire was brought down. Another witness, called by defendant, testified that, if the switch bar was in Pricer's hands when the 2,300-volt live wire was struck, the current would probably have caused severe injury or instant death, and doubtless the jury so believed.

In view of all the evidence the jury were, as we view it, justified in concluding that Pricer must have known that it was dangerous to grasp an iron bar and strike a live wire with it, and that, if he brought it to the ground by the switch bar, he must have done so by throwing it against the loosened wire or into the loop. Or, on the other hand, if the instrument which he held in his hand was only about three feet in length, as Mrs. Bstandig testified, the jury probably concluded that he struck the wire with the wood-handled pick-up, which is about two feet in length, or threw it into the loop. There is no evidence that Pricer received any shock, or suffered any inconvenience, by the manner in which the wire was brought to the ground. Certain it is that his death was not so brought about.

The electric company contends that the wire was broken by a rain and wind storm the morning of June 25, the day of the accident, and that, altogether aside from Pricer's alleged negligence, it is absolved from blame in the premises for that reason. The jury doubtless concluded that, if the wire in question had been properly insulated and was in the ordinary, usual and reasonably normal condition to carry the electric load required of it and to perform the function for which such wires are made and intended and used, it would have withstood the storm, which the evidence shows was not unusual in the vicinity at that time of year.

Whether the electric company exercised reasonable diligence in the inspection of its wires, and particularly at the place where the break occurred, was a question of fact for the jury. The court instructed the jury that the burden was on plaintiff to show by a preponderance of the evidence that the electric company was negligent and careless, "(1) in failing to have the wire in question properly insulated; (2) in failing to inspect said wire so as to know of its condition and repair it more promptly; (3) in using said wire when it was out of repair; (4) in permitting the wire to remain broken and continuing to charge it with a heavy voltage of electricity after it was so broken; (5) in omitting to repair it as soon as practicable after it found out that it was broken; and (6) in knowing or having reason to know that the said wire was broken, and nevertheless failing to shut off the power from said wire or to repair or remove the same within a reasonable time." "This case sounds in negligence, and in order to justify a verdict in favor of the plaintiff she must prove by a preponderance of the evidence (1) that the defendant Lincoln Gas & Electric Light Company was guilty of negligence in one or more of the particulars set out in the petition and detailed in instruction numbered 1 of these instructions (hereinbefore noted); (2) that such negligence on its part was the proximate cause of the accident and of its injury and death of the deceased; and (3) that by the death of the deceased his widow and child were damaged in some amount which you can determine from the evidence."

The defendant requested the court to instruct the jury that there was no evidence tending to prove that the wire was not properly insulated. The instruction was refused, and properly so, in view of the evidence on the question of insulation. And it is argued that the court erred "in submitting to the jury as an issue an alleged failure on the part of the defendant to inspect the wire in question." We do not think error can be predicated upon either assignment. It appears to us that there was sufficient competent evidence on these questions to go to the jury and to support

a finding of negligence against the electric company on both grounds. As hereinbefore noted the jury were properly instructed upon every material question in the case and there is ample evidence to support the verdict.

Unless the motorman can be charged with negligence or with bravado, or with indifference for his own safety, he cannot be said to have been guilty of contributory negligence or carelessness in the performance of duty. That he lost his life in an heroic and praiseworthy effort to prevent injury to others, or perchance death, by reason of the negligence and the carelessness of defendant and its employees who failed in the performance of their duty, no doubt appealed to the jury. The evidence which tends to prove that the electric company was informed about 7 in the morning that its wire was down and that it disregarded the information so conveyed doubtless produced a strong impression upon the mind of the jury and caused that body to believe that the electric company was grossly negligent in the premises.

Complaint is made that the verdict is so excessive as to show passion and prejudice on the part of the jury. We do not think so. At the time of the accident plaintiff's husband was 24 years of age. He had a wife and one child, an infant daughter, Thelma, then aged 7 months. In his occupation as a street car conductor he worked 12 hours a day, for which he received 52 cents an hour for 7 days a week, or almost $2,300 a year. He was a graduate of the Grand Island high school. He was a thrifty man. He had a savings account in a Lincoln bank. It was shown by the Carlisle table that the expectancy of a man of 24 is a little over 37 years.

Who can tell what door of opportunity for usefulness may open to an honest, ambitious and thrifty young man of 24 years? Had the decedent been spared to live out the allotted span of life, its influence upon his daughter, Thelma, now fatherless, could not be measured by the dollar mark. But, the fact must be recognized that, while the protection which a good husband's life affords to the home cannot be com-

puted in monetary terms, the wisdom of the ages has ordained that such computation, based on pecuniary loss, is the only one which the law recognizes and which the jury are compelled to apply.

In view of all the facts before us, and when we take into account the increase in living expenses in recent years, we do not feel constrained to reduce the amount of the verdict. As we review the evidence, we cannot bring ourselves to conclude that the jury were moved by passion and prejudice in the rendition of its verdict, and therefore it will not be disturbed.

Objections to certain impeaching questions which were addressed to one of plaintiff's witnesses, were properly sustained under sections 8844 and 8848, Comp. St. 1922. Section 8844, with respect to witnesses, provides: "When the matter sought to be elicited would tend to render him (the witness) criminally liable, or to expose him to public ignominy, he is not compelled to answer, except as provided in the fourth next following section." Section 8848 provides: "A witness may be interrogated as to his previous conviction for a felony. But no other proof of such conviction is competent except the record thereof." *Young Men's Christian Ass'n v. Rawlings*, 60 Neb. 377; *Boche v. State*, 84 Neb. 845. It may, however, here be added that the witness, of his own motion, denied the imputations which were sought to be established.

Other assignments of alleged error have been presented in the brief which we do not find it necessary to discuss. The judgment of the district court is right and is in all things

AFFIRMED.

Letton and Good, JJ., concur in the conclusion.