EDITH L. BANEY, ADMINISTRATRIX, APPELLEE, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT: STATE OF NEBRASKA, APPELLEE.

FILED MARCH 14, 1928. No. 26037.

*Byron Clark, Jesse L. Root, Reavis & Beghtol* and *J. W. Weingarten*, for appellant.

*O. S. Spillman, Attorney General, Lester L. Dunn, George E. Hager* and *Clifford L. Rein, contra.*

Heard before Goss, C. J., Rose, Dean, Good and Eberly, JJ.

Dean, J.

This is an action at law wherein Edith L. Baney, plaintiff, widow of George W. Baney, sued to recover damages which she alleges she sustained by the accidental death of her husband which was caused by the Chicago, Burlington & Quincy Railroad Company, defendant, in that the company negligently failed to furnish a reasonably safe, efficient, and workable air-locking device on a certain steel dump railroad car which was owned, or at least furnished and operated, by the defendant company, in hauling dirt from the state capitol square and dumping it on the state fair grounds from one of the above mentioned dump cars. Besides his widow, the decedent left surviving him four minor children, namely, Edith 8, Joan 7, Marguerite 4, and George 2, and these children, as alleged, are all dependent upon plaintiff for support and schooling and the like. Baney was an employee of the state of Nebraska when the accident happened. Hence, the state became a party defendant and, in respect of the state's liability or interest herein, the court ordered and adjudged that "the matter of rights and liabilities between plaintiff and the defendant state of Nebraska be reserved until ruling on motion for new trial."

The plaintiff filed a remittitur in the sum of $20,000, on condition that a rehearing be denied. The instrument, which includes the remittitur within its recitals, and also matter in respect of the state's alleged liability, follows:

"Comes now Edith L. Baney, administratrix of the estate of George W. Baney, deceased, plaintiff, in person and by her attorneys George E. Hager and Clifford L. Rein, and

hereby freely and voluntarily remits, from the verdict of the jury in the sum of $45,000 heretofore rendered herein, the sum of $20,000, and hereby freely and voluntarily consents that the said court may enter judgment against the Chicago, Burlington & Quincy Railroad Company, a corporation, defendant, and in favor of the state of Nebraska, defendant, for $5,400, the amount due the state of Nebraska under the Nebraska workmen's compensation act, and against the Chicago, Burlington & Quincy Railroad Company, a corporation, defendant, and in favor of Edith L. Baney, administratrix of the estate of George W. Baney, deceased, plaintiff, in the sum of $19,600, the amount due said plaintiff under the Nebraska workmen's compensation act."

Upon submission of the remittitur the court entered the following order:

"This court having heretofore ordered that the plaintiff file a remittitur of $20,000 herein, and it now appearing that the plaintiff has filed remittitur in said amount, the court now orders that the state of Nebraska will continue weekly (workmen's compensation) payments to plaintiff as heretofore ordered by this court, and upon any final judgment herein, same to be paid into this court for adjustment with compensation payments heretofore ordered."

The state has not appealed. The defendant railroad company alone has appealed to have the proceeding and judgment reviewed.

The accident occurred August 20, 1925, in connection with the unloading of dirt on the Nebraska state fair grounds adjacent to Lincoln. Baney was then a robust, able-bodied man of 31 years. As a state employee he and other workmen had somewhat to do with the filling and levelling of low and uneven surface depressions on the state fair grounds with dirt hauled from the site of the new capitol building. More than 4,500 car-loads of this dirt were loaded on steel dump cars by steam power shovels from the excavations made on the state house grounds preparatory to the erection of the new state capitol build-

ing and the substructure or basement. When a train of these cars was loaded it was hauled by gasoline tractor engines on temporary steel rail tracks from Fifteenth to Seventh street and from thence to and upon the state fair grounds. The gasoline tractors were furnished by the state, and driven by state employees, and all temporary rail tracks, which are referred to herein, and wherever laid, were furnished and installed by the state.

The loaded cars, on arrival at destination, were hauled or pushed for the most part by the defendant's locomotive engines from place to place thereon and dumped at such points as the filling and levelling process on the fair grounds might require. Baney, with other state employees, worked at spreading and levelling the dirt. Shortly after one of the cars was dumped, and while Baney and another employee were cleaning out the moist dirt that stuck to the side of the car, for it was a rainy day, the moving parts of the car suddenly, and without warning, "returned from an inclined to a horizontal position," and Baney's body was caught, his chest was crushed, and he instantly died. Shortly afterward the car was opened with crowbars and the body was released. And in defendant's answer and in its brief it is admitted that Baney's death was caused "by his being caught and fatally injured between the moving parts of a dump car."

The plaintiff contends, as above stated, that the defendant railroad company negligently failed to keep its car-locking device in a reasonably safe condition. This device, when in normal working order, was intended to hold the moving parts of the car, after it was dumped, in an upright position until such moving parts were released and, upon such release, the moving parts automatically returned to a horizontal position. The controlling mechanism of this dumping apparatus was in the cab of the locomotive as a part of its equipment and was so placed as to be readily accessible to the engineer, or engine foreman, for control and release as occasion should require. In their brief plaintiff's counsel make the following state-

ment: "On August 20, 1925, at about 11 o'clock in the morning, the Burlington's crew, in charge of its engine foreman, John Gettman, pulled into the fair grounds a train of 10 or 12 of these dump cars loaded with dirt. Before spotting the cars in the locality where the dirt was wanted, the engineer, Smith, stopped the train and Gettman got off and inspected the track."

It will not be denied that John Gettman, the engine foreman, and locomotive engineer Smith were both employees of the defendant railroad company at the time of the accident. The plaintiff alleges that Gettman applied the air. From the record it fairly appears that either Gettman or Smith must have applied the air, but the dumping device failed to work, as above noted. The defendant argues "that the railroad company furnished a man to dump the car, and not to unload the dirt." This feature will presently be discussed.

In respect of the place of the accident one of the civil engineers, who was engaged by the state in the project, testified that the track "was about level at that place." In this he was corroborated by one or more of the state's witnesses. But this was a disputed question for the jury. This engineer also testified that Baney's duties were "to maintain and construct that track in accordance with the desires of the Burlington trainmen and the Burlington officials that might be there." Upon further inquiry he repeated the above statement and added that "somewhere around 40" dump cars, each of 20-yard capacity, were used from time to time in hauling the dirt. He averred that the closing of the moving parts of the car that killed Baney could have been prevented by applying "the air to the cylinder," had the equipment of the air dumping device been in a normal working condition.

It is not denied that all of the eight or ten steel dump cars in the train were equipped with the same type of dumping device and that some of these cars were dumped by air pressure before an attempt was made to dump the car in suit. It is not denied that the air device having

failed to function after several attempts the car in suit was finally dumped in an unusual manner. A cable was attached to one side of the dump car and by this means it was pulled over into "dump position" by a tractor. And this was necessitated solely because the dumping device failed to perform its function. When the car was dumped a considerable quantity of wet dirt remained in the car and it became necessary to move forward about 100 feet to find a low spot on which to scrape out and unload the remaining dirt. The car having now been pulled over into a "dump position" by the tractor, Baney and two other workmen proceeded to scrape and shovel out the dirt that remained. As above noted it was while he was so engaged that Baney was killed, but both of his fellow employees escaped. Both of these workmen testified that they heard no warning given to Baney nor to any other workmen "that were working around that car, to the effect that the car was liable to fall and that it was in dangerous condition." It is also disclosed that before the accident, short-handled shovels were furnished by the state and were used for shoveling and scraping the remaining dirt out of the cars, but that after the accident the state supplied long-handled shovels for this work.

The defendant railroad company charges that Baney neglected to see that the tracks were reasonably level. But a witness, who was prominently identified with the manufacture of the identical steel dump cars in question here, testified that the cars were intended to be used on a track that was "somewhat uneven." The defendant company pleads ignorance of the condition of the tracks and of what Baney was doing in this language:

"The railroad company did not know about the peculiar condition of the track where the car was being unloaded, did not know what Baney was doing, nor what he directed the state's employees to do, nor their compliance with his instructions."

This argument will be presently discussed. If the argument is supported by the evidence it is important.

The superintendent of the Lincoln division of the defendant railroad company was one of the defendant's main witnesses and had then occupied the position of superintendent of the division for 15 years. He testified that he talked with Baney, while he was engaged on the work, solely in behalf of his employer and as an important part of the responsible duties which fell to him as superintendent of the division. This superintendent averred that he was on the fair grounds "a good many times" while the work was in progress, and it affirmatively appears that he not only knew "the peculiar conditions of the track," but that he also knew "what Baney was doing." He talked with and advised Baney about keeping up the track, and testified that Baney told him "that he formerly had worked on tracks, and was familiar with that kind of work." The superintendent continued: "I explained to him at that time that my experience in handling dirt was such that I always preferred to have the ties, the cross-ties, weaved closed together underneath the rails, and suggested to him that he follow that practice, and I talked with him a number of times afterwards in regard to pulling his track up, and keeping it in better shape." But the superintendent testified that Baney told him that he "did not care to weave the track ties so close together and that he would keep the track safe so that cars could be operated over it;" that he told Baney that the dump cars "were liable to dump in most any position," and that Baney immediately said he knew all about them. Continuing he testified: "Q. What would you say with respect to the elevation of the rails compared with each other? A. Well, there was a super-elevation of the west rail of six or seven inches. I did not measure it, but I judge about that."

If this division superintendent's evidence fairly reflects the facts, it tends to prove that Baney was belligerent in his resentment of the superintendent's advice; that he was an incompetent person and totally unfit to have charge of the work in which he was engaged; that Baney's presence on the job in the capacity of track foreman was a menace

to himself and to the employees with whom he worked, and it was a destructive menace, as well, to the cars and the locomotive engines of the railroad company that were used in the furtherance of the project in which the defendant was engaged.

However, it does not satisfactorily appear that the division superintendent made complaint, in respect of Baney's alleged incompetence, to the state capitol commission. H. A. Baugh, a civil engineer who was employed by the capitol commission for two years on the project in question, testified that no complaint was made by the railroad company to him concerning Baney. Mr. Manion, also a civil engineer over Baney, testified that no complaint was made by any person to him. And the division superintendent himself testified on this point:

"Q. You were out there from time to time as the work was going on? A. Yes; I was there a number of times. Q. As far as you could see this track was kept up about as well as could be expected under the circumstances? A. Not as well as I would keep a track of ours up. Q. You made no complaint to Mr. Manion or any of the state officials about it? A. We talked to the capitol commission over the phone about it a number of times, and talked with Baney. Q. Who did you talk with? A. I am not sure, I have no record. Q. You knew Mr. Manion was in direct charge of the work? A. After Baugh left; but I never saw Manion, I don't believe, but once after Mr. Baugh left here, as far as I know. Q. Did you make inquiry for Manion? A. No; not that I know of. Q. He was on the job there about every day? A. I don't know. I did not see him out there. Q. You don't know whether he was there or not? A. I don't know. Q. At any rate the work was not done in such a manner as to cause you to make any complaint to Mr. Manion, who was Mr. Baney's immediate superior officer? A. Complaint about what? Q. About anything that was wrong out there, the tracks, or any other thing, that you say that was not right? A. Well, the only conversation I had—I had none with Manion. Q.

How is that? A. I had no conversation with Manion. Q. Didn't you know that Manion was in charge of that work, a gentleman by the name of Manion? A. I imagine he was the engineer, yes; in fact, Baugh told me he was relieving him. Q. Don't you know he would be the natural and logical man to whom complaint might be made, or should be made, if there was any complaint? A. Yes. Q. And yet you made none? A. No; I had no occasion to hunt Manion." And on the redirect examination he testified: "Q. You did talk to Baney however? A. Yes."

Whether an employee of the capitol commission, or of the defendant company, directed that the car be pulled over by the tractor into "dump position" does not clearly appear. On this feature, as elsewhere, the evidence conflicts. We do not agree, however, with counsel's observation that "the accident was in no way connected with this dumping process."

It appears that the dumping device had not been examined or tested within the time required by the rules of the interstate commerce commission: On cross-examination the defendant's general car foreman testified: "Q. So, then, there had been no inspection or cleaning or oiling of the cylinder in the air apparatus on the left-hand side of this car since April 22, 1924, up to the time of the accident? A. According to our record. Q. Would you say your record is reasonably correct? A. It should be. * * * Q. That would be a year, April, May, June, July, August, practically a year and four months after the inspection and oiling and cleaning of this cylinder, wouldn't it? A. That one of them." When asked if he was told that the car could not be operated by air pressure immediately before the accident, he answered: "A. No; I don't remember that I was told that exactly. Q. You say to this jury that you did not know that that car had been pulled over by the tractor immediately before? A. I was told they pulled it over with a tractor; yes, sir. Q. My question was, you were told they could not dump it by the air pressure at that time, weren't you? A. I was told that they tried

to dump it—well, I don't know that I was exactly told that; finally, in a conversation I was told that they pulled it over with a tractor. Q. Did you inquire why they pulled it over with a tractor? A. I don't know that I did. Q. That was a common thing was it, to dump these steel dump cars by pulling them over with a tractor? A. No, sir. Q. And that thing did not excite any curiosity in your mind? A. Not necessarily. Q. And you did not make any inquiry as to why they pulled it over? A. I don't know that I did. Q. You knew that they could not operate it with the air at that time, didn't you? A. I cannot say that I knew. I was told probably, but I don't know, I did not see it. Q. You were told that was true, that is my question? A. Well, I cannot say to that exactly whether I was told."

Continuing on the cross-examination this witness further testified with respect to the inspection of the car: "Q. Why didn't you inspect it? A. I did. Q. Why didn't you turn the air on and see whether or not those cylinders were leaking and whether or not you could operate them? A. I don't say I didn't look at it. Q. You didn't say you did not either? A. No; I did not say I did not. Q. Do you know when the car was moved off the fair grounds? A. No; I do not. Q. Do you know where it was taken when it was removed off the fair grounds, of your own knowledge? A. No, sir. Q. You saw it next out at the rip (repair) track, didn't you? A. Yes, sir. Q. Five days afterwards? A. Yes, sir. Q. You don't know what repairs may have been made upon the air apparatus, do you? A. Well, I know that much, that we do not make any of that stuff only on the repair track, any such repairs only on the repair track." This witness further testified: "Q. Now, Mr. Baker, I want to ask you again, can you give any reason why you did not connect up the air that was in that train line of that air dump apparatus on the day, right there at the time of the accident, and test it out? A. Well, I don't know. I might answer that this way. I did not say that I did not hook up the air, nor I don't say that I did. It ain't clear in my mind whether we did or not.

That is the reason I am not saying one way or the other."

When the side of the car collapsed, Baney, as noted above, was scraping the sticky dirt from the side of the car. That he was not idly standing by but was diligently attending to the work of his employer is affirmatively shown by the entire record. The defendant, however, argues that Baney was warned that the work in which he was engaged was a dangerous occupation. But there is the evidence of witnesses who were present and in a position to have heard such warning if it had been given, and they testified, as noted above, that they heard no such warning. But this was a question of fact for the jury, and the question of the veracity of the witnesses, or the lack of it, was also for the jury. And it may here be observed that the material facts were submitted to the jury for determination under instructions which informed the jury in respect of the weight of the evidence, the credibility of the witnesses, their fairness, candor, bias, or prejudice, and their opportunity for knowing the facts about which they testified, and the reasonableness of their testimony or the lack of it.

It will be presumed, of course, that counsel intend that the words used in argument shall have their generally accepted meaning. In the present case counsel argue "that the railroad company furnished a man to dump the car and not to unload the dirt." But, if the man who was so furnished dumped the car, would there have been anything left to "unload"? What is it to dump a car? This is an accepted definition of the word "dump": "To put or throw down with more or less of violence; hence, to unload, as from a cart by tilting it, as to dump sand, coal, etc. Chiefly U. S. * * * To deposit something in a heap or unshaped mass as from a cart or basket. Chiefly U. S." The words "dump car" are defined as follows: "A cart or car having a body that can be tilted, or a bottom opening downwards, for emptying." Webster's International Dictionary.

The record is voluminous and the assignments of alleged error are many. In a foreword in respect of this feature

of the case the defendant says: "In presenting the following 140 assignments of error, we do not wish the court to understand that those assignments, of which there are a large number dealing with the reception of evidence over objection, are based solely on technical grounds. * * * It is because counsel do not desire the court to gain the impression from the assignments that they relate only to technicalities that this brief analysis is made as introductory to our presentation."

The defendant argues that the verdict and judgment are excessive. We do not think so. In a comparatively recent case we held that a verdict and judgment for $25,000 was not excessive where a man of 24 years lost his life by electrocution, having a wife and a child of 7 months, and who earned about $2,300 a year as a motorman on a street railway car. *Pricer v. Lincoln Gas & Electric Light Co.,* 111 Neb. 209.

Briefly, and in part to recapitulate: The defendant railroad company, under a state contract, hauled dirt from the state capitol square to the state fair grounds in steel dump cars. The cars were equipped with an air-dumping device whereby the load could be dumped from the engine cab. The defendant company concedes that it furnished "a man to dump the car and not to unload the dirt." On a loaded car, after repeated efforts, the dumping device failed to work and the car was then dumped by hitching a tractor to one side and pulling it over into a "dump position." Thereupon the tractor was released and George Baney, the decedent, began to shovel the dirt out that remained in the car after the bulk of the load was dumped. While so engaged the dump car suddenly, and without warning, returned from a "dump position" to a "normal position," and Baney's body was caught in the moving parts of the car and he was thereby instantly killed.

To discuss all of the 140 assignments of alleged error, above mentioned, referred to by defendant's counsel, would require more space than should be allotted to this opinion. It appears that every material question was submitted to

the jury, under instructions which fairly stated the law applicable to the facts, and, as triers of fact, the jury have rightly determined the issues, and there is sufficient competent evidence to support the verdict. From what has been said, it follows that the verdict for $45,000, as reduced by the order of the court to $25,000, to which plaintiff assented, and the judgment thereon, must therefore be, and it hereby is,

AFFIRMED.